# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID TRINH,

                    **Civil Action No.: 1:21-cv-105**

        Plaintiff,

v.

                    **COMPLAINT**

                    (Jury Trial Demanded)

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Defendant.

Plaintiff David Trinh, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

## INTRODUCTION

1.     For years, IBM has perpetrated an institutional bait-and-switch with how it pays commissions to sales representatives. Throughout IBM's messaging to them, from how it directs managers to explain commissions to how it uses presentations to highlight the program features, IBM consistently and repeatedly represents that commissions are uncapped. Indeed, IBM's Rule 30(B)(6) witness admitted under oath in depositions in similar lawsuits that IBM has "an obligation" not to cap sales representatives' commissions payments and that it's reasonable for sales representatives to rely on that.

2.     IBM tells sales representatives that ["they"] can make a million dollars!" and that their income is limited only by how much they are able to sell. But that's not the truth. The truth is that IBM frequently does cap commissions. And

IBM intentionally misleads sales representatives about the program because it knows that an "uncapped commissions" program is highly motivating to sales representatives and incentivizes them to pursue big deals. On the contrary, capping commissions de-motivates sales representatives because when they reach the cap they can't make any more commissions no matter how big the deal is. And, since a big deal is often extraordinarily difficult to close, requiring long hours and repeated out-of-town travel, IBM knows that being honest about its capped commissions program would significantly limit the number of those big deals.

3.     For years, IBM has known that sales representatives, and even managers, believe IBM when it says commissions are uncapped. In fact, the IBM department that handles capping frequently gets calls from sales representatives and managers that are upset about getting capped after being told that IBM does not cap commissions. Yet, IBM does nothing to attempt to eliminate the problem by explaining its real practice.

4.     The reason IBM doesn't attempt to explain that it caps commissions is simple: profit. As it stands, IBM is able to have its cake and eat it too because it can successfully motivate its sales team to pursue the big deal for IBM, but never have to pay a fair commission for the extraordinary effort the sales representative expended to close it.

5.     Plaintiff David Trinh is another victim of IBM's blatant misrepresentations and doubletalk about uncapped commissions. Despite promising Mr. Trinh that his commissions were uncapped, IBM capped his commissions on the several deals that he closed in 2018 and 2019. He has filed this action to recover the damages he's incurred from IBM's wrongful capping of his sales commissions and to stop IBM's deceptive and unlawful practice.

6. This case is different in one particular way from many of the other IBM commissions cases around the country: after capping his commissions, IBM wrongfully terminated Mr. Trinh on December 2, 2020.

7. Unbeknownst to Mr. Trinh, shortly before that six other IBM employees had submitted a whistleblower complaint to an internal IBM ethics board related to theft of intellectual property and reported that Mr. Trinh was a material witness to the theft. All six of those employees were fired along with Mr. Trinh.

## PARTIES

8. Mr. Trinh is a citizen of Wake County, North Carolina.

9. IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is in the State of New York.

## JURISDICTION AND VENUE

10. Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

11. This Court has personal jurisdiction over IBM.

12. Venue is proper in this Court.

13. This action has been brought within all applicable statute of limitations and/or repose.

## FACTUAL ALLEGATIONS

14. Mr. Trinh joined IBM as an experienced software sales representative in 2015, and he has worked in software sales since 2000.

15. Throughout his career, Mr. Trinh was very successful and highly respected in his position. Mr. Trinh routinely exceeded his quotas since joining IBM and has been one of the top performing sales representatives responsible for selling software related services.

### IBM Promised Mr. Trinh His Commissions Were Uncapped.

16. Mr. Trinh's compensation as an IBM sales representative consisted of a base salary paired with uncapped commissions. Mr. Trinh's commissions consisted of a tiered, uncapped commission based on Mr. Trinh's attainment as a percentage of his quota achieved.

17. During his time at IBM, Mr. Trinh and other sales representatives regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 pages worth of slides and are collectively referred to as the "Educational Materials." Each year, the Educational Materials explained that sales commissions were uncapped. Nowhere in the Educational Materials is there anything stating or even suggesting that sales commissions may be capped in some instances or that IBM reserves the right to cancel or modify whether and to what extent commissions may be capped. The Educational Materials are unequivocal and state repeatedly that commissions are uncapped. The Educational Materials were also available for Mr. Trinh, and other salespeople, to download during the entirety of 2018, 2019, and afterwards.

18. Mr. Trinh's commission plan for the second half of 2018 (2H 2018) ran from July 1, 2018 through December 31, 2018; Mr. Trinh's commission plan for the first half of 2019 (1H 2019) ran from January 1, 2019 through June 30, 2019; and Mr. Trinh's commission plan for the second half of 2019 (2H 2019) ran from July 1, 2019 through December 31, 2019.

19. During those same time periods in 2018 and 2019, Mr. Trinh received and reviewed a presentation (the "PowerPoint"), which constituted a portion of the Educational Materials for those periods. IBM also made the PowerPoint available for Mr. Trinh, and other sales representatives, to download during the entirety of the sales periods and afterwards, as a resource that they could continually refer back to if they had any questions about their commissions. This PowerPoint

4

constitutes a continuing representation by IBM to sales representatives, including Mr. Trinh, about how they should understand the terms of their commissions compensation.

20.     IBM made a substantially similar version of this PowerPoint available to Mr. Trinh each six months for the purpose of highlighting and explaining the important terms of his compensation.

21.     The PowerPoint was titled "Your 2018 Incentive Plan Individual Quota Plan for Sellers" and it stated that the presentation was the "primary 2018 education for IBM sales employees and managers." It further stated that "[i]t covers the information you will need to understand your 2018 plan."

22.     In every sales period prior to this one, the substantially similar versions of this presentation included the phrases "earnings opportunities remain uncapped" and "payments uncapped."

23.     Starting in the first half of 2018, in response to lawsuits filed by the undersigned counsel, IBM removed the phrases "earnings opportunities remain uncapped" and "payments uncapped" from this PowerPoint.

24.     Regardless, IBM's policy remains that sales commissions are uncapped, and IBM has testified under oath that sales commissions remained uncapped. That's further evident because, as noted below, there are still PowerPoints that tell IBM sales representatives in writing that commissions are not capped.

25.     IBM instructs its managers to tell sales employees during the sales kickoff calls at the beginning of each sales period, and the managers actually do tell them, that commissions are uncapped.

26.     Indeed, Mr. Trinh's managers, including Gregory Kaplan, Eric Berridge, and Paul Chesek, dutifully followed IBM's instructions, telling him things at the beginning of each sales period with respect to his commissions such as: "this

is an uncapped plan"; "you have unlimited earning potential under this plan"; and "your commissions are uncapped."

27. Maria Lipner, the global head of commissions at IBM, testified recently under oath in another commissions dispute that IBM's policy during the 2H 2018 period was that commissions were uncapped.

28. That commissions are uncapped is also reflected in the "payout tables" contained in the PowerPoint, which demonstrate that accelerators continue to apply above certain quota attainment thresholds. These payout tables do not set any upper limit for commissions, consistent with IBM's policy and representations that commissions remained uncapped.

29. The representations that sales commissions are uncapped were often repeated in sales meetings and by IBM managers, both formally and informally.

30. Uncapped commissions has been a core component of compensation for sales employees like Mr. Trinh who are on on Individual Quota Plans for many, many years.

31. In January 2019, IBM sent another PowerPoint to Mr. Trinh that set forth information about his commissions plan. This PowerPoint was entitled "Compensation Overview" "Bluewolf Go-to-Market Teams." Mr. Trinh was part of the Bluewolf team at IBM.

32. The third slide is entitled "2019 Bluewolf Incentive Plan Design Principles" and sets out how commissions are paid at IBM, including that: "Amounts earned under Bluewolf 2018 plans, and not paid in 2018, will be paid in 2019" and "*Plans are not capped*." (emphasis added)

33. Here, Mr. Trinh's commissions were arbitrarily capped for the sole purpose of limiting his earnings related to deals that he closed in the second half of 2018.

Case 1:21-cv-00105-NCT-JEP   Document 1   Filed 02/05/21   Page 6 of 28

**Mr. Trinh's Commission Payments Were Capped.**

34.     In 2018 and 2019, Mr. Trinh worked on behalf of IBM to close series of telecom deals – about 20 – with Telecom Argentina and other customers ("Telecom Deals"). Mr. Trinh was the main sales representative from the Bluewolf team responsible for the deal.

35.     Upon information and belief, all other individuals who were a part of the Telecom Deals were paid without issue.

36.     Mr. Trinh's efforts in closing the deals resulted in total sales of approximately $47,000,000.

37.     On the total recognized revenue credit of $47,000,000, Mr. Trinh earned commissions of approximately $663,486 in 2018 and 2019, which should have been paid to him via three payments in 2019. These commissions were earned on about 20 deals altogether.

38.     Mt. Trinh received payments totaling about $426,000. But, in early 2020, IBM failed and refused to pay the remaining $237,486, i.e. the full balance owed to Mr. Trinh for his work on the Telecom Deals. These commissions were owed in connection several deals not just one large deal. In short, Mr. Trinh's commissions were capped.

39.     At the time, Mr. Trinh's first-line manager was Gregory Kaplan, and his second-line manager (i.e. Kaplan's boss) was Eric Berridge. Paul Chesek took over as Mr. Trinh's first-line manager in the second half of 2019.

40.     Telecom Argentina was an account that Mr. Trinh was assigned and that he had been calling upon since 2017.

41.     Alvin Jenkins took over as Mr. Trinh's first-line manager in November of 2019 and Mr. Trinh was essentially told that his commissions were being capped. Jenkins said it was because what Mr. Trinh had earned was too much money, "[IBM] was overpaying people," and what he had already been paid "seemed fair."

7

42. Mr. Jenkins never said that IBM was applying the "Specific Transaction" provision or anything like that. The only reason Mr. Trinh was given by IBM was that what IBM owed him was too much money.

### Mr. Trinh Has Recently Learned That IBM Routinely Misrepresents That It Does Not Cap Commissions

43. Recently, Mr. Trinh has learned that IBM has a history of capping commissions.

44. The sales field in which Mr. Trinh worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its sales representatives that commissions could be capped, it would be severely hampered in its efforts to recruit good sales representatives. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high achievers after the fact.

45. There are other cases that have been filed around the country, including in the Middle District of North Carolina, and the Northern District of California that are very similar to this one and that have yielded significant discovery. One of those cases is Bobby Choplin v. International Business Machines Corporation, No. 16-cv-1412-TDS-JEP ("the Choplin Action"), which was recently resolved. The plaintiff in the Choplin Action had an IPL that was in relevant part identical or substantially similar to Mr. Trinh's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Trinh. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Trinh, and what IBM actually paid him and why.

46. In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit A**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit B**); (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit C**); and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the highest-level sales managers in the corporation) (**Exhibit D**). Together, Exhibits A, B, C, and D are referred to as the "Choplin Depositions." All of this testimony taken under oath in the Choplin case, including the testimony quoted below, applies equally and fully to Mr. Trinh here.

47. The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for sales representatives like Mr. Choplin and Mr. Trinh; (2) sales representatives like Mr. Trinh were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Trinh, was "capping." For example:

    a. IBM testified as follows:

> Q. The fourth bullet point, you could read that, please.
>
> A. "Earnings opportunity remains uncapped."
>
> Q. Okay. So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby Choplin that his earnings opportunity remains uncapped, wouldn't you?
>
> A. Correct.

Case 1:21-cv-00105-NCT-JEP   Document 1   Filed 02/05/21   Page 9 of 28

> Q. Would you also agree that IBM represented to Bobby Choplin regarding his first half of 2015 compensation plan that payments were uncapped?
>
> A. Correct.
>
> Q. So would you agree that IBM had an obligation not to cap Bobby Choplin's earnings opportunity?
>
> A. Yes.
>
> Q. Would you agree that IBM had an obligation not to cap Bobby Choplin's payments?
>
> A. Correct.

(Exhibit A, pp. 18-19.) When asked specifically about whether a salesperson could reasonably rely on the statements in the PowerPoints, IBM testified:

> Q. And it would be reasonable for a salesperson like Bobby Choplin to rely on the information in Exhibit 65, 66 and 67 [PowerPoints] regarding their compensation plan?
>
> A. Yes.

(Exhibit A, pp. 67-68.)

    b. Mr. Batthany testified as follows about the statements in the PowerPoint that commission would be not be capped:

> Q. Okay. It would be reasonable for someone to understand that their commission payments were uncapped in the first half of 2015, wouldn't it?
>
> A. Yes.

(Exhibit B, p. 79.) Mr. Dorsey similarly testified that, if he were a salesperson and read the statements in the PowerPoint, he would think that his earnings were uncapped. (Exhibit D, p. 48.)

    c. Ms. Maleki testified as follows about what exactly constitutes capping:

Q. What does that mean to you?

A. Capped?

Q. Right.

A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.

Q. Something different than what your commission formula would produce?

A. Correct.

(Exhibit C, p. 25.)

Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?

A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped.
…

Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?

A. I do see that.

Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?

A. That's what I'm seeing, yeah.

Q. But that's not true from what you remember at IBM?

A. That's correct. I don't believe that's true.

11

(Exhibit D, pp. 43, 46-47.)

48.     The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments.

49.     Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, on both the LabCorp and BB&T Deals by approximately $600,000. (**Exhibit E**).

50.     IBM's Rule 30(b)(6) designee in the Choplin case testified that IBM is not "capping" commissions, only "adjusting" them. (Exhibit A, p. 45). He further testified that "as long as IBM's adjustments are to a specific deal and not all deals, IBM's position is that's not a cap." (Exhibit A, p. 107).

51.     Contrary to Mr. Martinotti's testimony on behalf of IBM, other IBM employees, including managers, executives, and sales representatives, are totally unaware of the distinction that IBM attempts to make between a "cap" and an "adjustment" and almost exclusively refer to what IBM does as "capping" or a "cap" on commissions. (Exhibit B, p. 43; Exhibit C, p. 27; and Exhibit E). Indeed, as noted above, they use that exact word in their internal emails.

52.     IBM claims that this usage of the word "cap" is a "mistake." (Exhibit A, p. 119). On behalf of IBM, Mr. Martinotti testified that sales representatives, managers, and other executives within IBM commonly use the term "capped" but shouldn't be using that term; they should be using the term "adjusted" instead. Specifically, he testified:

Q:     Have you had anyone at IBM come to you after an adjustment and say, you know, "IBM capped me on this deal?"

12

A:     And I would go back to them and say that they didn't cap you; they adjusted you.

Q.     Okay. So, first, let me – that has happened?

A.     Yes.

Q.     Okay. So you would agree there is some confusion about the difference between a cap and an adjustment of commissions?

A.     The answer is yes, there is confusion or, said differently, they use the term interchangeably incorrectly.

Q.     Who is "they"?

A.     The sales representatives.

Q.     Okay, okay. You think – and managers too right?

A.     Right. **Every adjustment they consider to be a cap**, and that's no – you know, a cap is not an adjustment and adjustment is not a cap.

(Exhibit A, p. 108) (emphasis added).

53.     IBM also testified that executives such as Mr. Moorer (the executive actually responsible for determining whether and how much to cap Mr. Choplin's commissions on the BB&T Deal), are similarly mistaken when they use the term cap:

Q:     So Mr. Moorer here is using the word "cap" and "capping" isn't he?

A:     Correct. He is using the word "capping."

Q.     Okay. He is making that mistake that you would correct him on, right?

A.     Exactly.

Q.     But Mr. Moorer is the one – is one of the people who exercises judgment on those of how much or how little to pay in commissions, right?

A.     Yes.

(Exhibit A, pp. 119-120).

54.     Despite IBM's contention that its sales representatives, managers, and executives are all "confused" and "mistaken" when they refer to IBM's conduct as "capping" commissions, IBM makes no efforts to clarify the confusion in its 200 pages of Educational Materials. (Exhibit A, pp. 80-82). Indeed, none of the Educational Materials (where IBM repeatedly promises commissions are uncapped) contain any qualifiers or fine print of any kind.

55.     IBM does not clarify this confusion because it knows that if sales representatives knew that IBM might cap their commissions, it would demotivate the representatives and lead to lower sales for IBM. (Exhibit A, p. 158).

56.      IBM has even been told by its managers that it cannot continue to make representations like that in light of IBM's actual practices. One manager, Tom Batthany, wrote an email protesting IBM capping the commissions of a sales representatives he managed, where he says: "We can no longer have folks stand in the front of the room and say reps make $1 million and there are no caps." (**Exhibit F**).

57.     Another case pending in the Middle District of North Carolina that is very similar to this one and that has yielded discovery is <u>William Stephenson v. International Business Machines Corporation</u>, No. 17-cv-1141 ("the Stephenson Action").  Upon information and belief, the plaintiff in the Stephenson Action had an IPL that was in relevant part identical or substantially similar to Mr. Trinh's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Trinh. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Stephenson, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Trinh, and what IBM actually paid him and why.

58. In the Stephenson Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit G**); (2) a deposition of Mr. Stephenson's first-line (i.e., immediate) manager, Benjamin Blackwell (**Exhibit H**); (3) a deposition of Mr. Stephenson's second-line (i.e., two levels up) manager, Cleo Clarke (**Exhibit I**); and (4) a deposition of Randolph Moorer, a high-level IBM executive (**Exhibit J**). Together, Exhibits G, H, I, and J are referred to as the "Stephenson Depositions."

59. The witnesses in the Stephenson Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions, including those portions quoted above.

60. Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case would "apply equally" in Stephenson's case because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases. The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

61. The Stephenson Depositions establish the following facts, among many others: (a) the PowerPoint had key information about commissions that was not in the IPL, it had more specific information than the IPL, its notes stated that it is the "primary" source for information about the commissions plan, and IBM itself has testified that the PowerPoint contains "the most detailed information" about a salesperson's commission plan; (b) the witnesses testified that IBM does not lie, and therefore that it is reasonable for salespeople to believe what IBM says—including its representation in the PowerPoint that "earnings opportunities" and "payments" were "uncapped"; (c) in fact, IBM testified that salespeople can "take that to the bank" when IBM says that it does not cap and that it's "not foolish" for them to believe that, and that IBM has an "obligation" not to cap as a result; (d) internal

15

IBM emails stated many times that IBM was "capping" Stephenson when it reduced his commissions as it did; (e) nowhere did IBM ever define "cap," although the witnesses testified that "capping" can occur when IBM reduces a commission on one specific deal; (f) IBM admitted that, at the very least, "reasonable minds could differ about how they use or understand the term 'cap' or 'capping'"; (g) IBM reduced Stephenson's commissions in order to satisfy a secret internal budget of commissions, based on a percentage of a deal's revenue—that is, the sole reason that Stephenson's commissions were reduced and the amount of the reduction were both based only on IBM's desire to reduce the amount of commissions payable to satisfy the budget; (h) IBM focused on the "high earners" and "high achievers" when deciding whom to cap, and not, for example, on those who worked less hard relative to their peers or whose commission was disproportionate to their work; (i) IBM did not purport to cap or actually cap Mr. Stephenson based on the Significant Transactions Provision of the IPL (j) one of the witnesses testified that what IBM did to Stephenson surprised her and did not "make sense" to her; (k) Martinotti, on behalf of IBM, testified that he did not see the emails about the reasons for Mr. Stephenson's commissions reduction until his deposition and that he did not "agree" with capping to stay on budget and that doing so would be "questionable"; and (l) Mr. Stephenson's commissions were actually "earned" under the terms of the IPL when he was capped.

62.    The testimony in the prior paragraph applies equally to Mr. Trinh, and in any event Mr. Trinh alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Stephenson was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport

16

to rely on or actually comply with the "Significant Transactions Provision" of the IPL.

63.     Another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is <u>David Swafford v. International Business Machines Corporation</u>, No. 18-cv-4916 ("the Swafford Action"). The plaintiff in the Swafford Action had an IPL that was in relevant part identical or substantially similar to Mr. Trinh's IPL, and the plaintiff was shown a PowerPoint presentation with representations that were in relevant part identical or substantially similar to the representations made to Mr. Trinh. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Swafford, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Trinh, and what IBM actually paid him and why.

64.     In the Swafford Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit K**); (2) a deposition of Mr. Swafford's first-line (i.e., immediate) manager, Mark Briggs (**Exhibit L**); (3) a deposition of Mr. Swafford's second-line (i.e., two levels up) manager, Richard Wirtenson (**Exhibit M**); and (4) a deposition of Donald Leeke, a high-level IBM executive (**Exhibit N**). Together, Exhibits K, L, M, and N are referred to as the "Swafford Depositions."

65.     The witnesses in the Swafford Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

66.     Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case and the Stephenson case would "apply equally" in Swafford's case because the relevant facts—the PowerPoints, the IPLs, and how and why IBM

reduced commissions, etc.—were the same in both cases. The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

67.    The Swafford Depositions establish facts that are similar or identical to those established in the Choplin Depositions and Stephenson Depositions, as outlined above. Most importantly, they establish: (a) that Swafford was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

68.    The key testimony in the Swafford Depositions applies equally to Mr. Trinh and in any event Mr. Trinh alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Swafford was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Specific Transactions Provision" of the IPL.

69.    And another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is Jerome Beard v. International Business Machines Corporation, No. 18-cv-06783 ("the Beard Action"). The plaintiff in the Beard Action also had an IPL that was in relevant part identical or substantially similar to Mr. Trinh's IPL, and the plaintiff was shown a PowerPoint presentation with representations that were in relevant part identical or substantially similar to the representations IBM made to Mr. Trinh. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Beard, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Trinh, and what IBM actually paid him and why.

18

70. The witnesses in the depositions in Beard also re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

71. Furthermore, IBM executive Inhi Cho Suh testified that much of the testimony in the Choplin case and the Stephenson case would "apply equally" in Beard's case because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases. The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

72. The Beard Depositions established facts that are similar or identical to those established in the Choplin Depositions, Stephenson Depositions, and Swafford Depositions, as outlined above. Most importantly, they establish: (a) that Beard was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

73. The key testimony in the Beard Depositions applies equally to Mr. Trinh and in any event Mr. Trinh alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Beard was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Specific Transactions Provision" of the IPL.

74. In short, of all of the cases alleging facts similar to those alleged in this case, eight have yielded significant discovery, two of which proceeded in the Northern District of California. In all of the cases, the discovery has shown that the key facts alleged were in fact true—and those facts apply equally in this case.

19

75.     Mr. Trinh has met all conditions precedent to the bringing of this action.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(Violation of the North Carolina Wage and Hour Act)**

</div>

76.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

77.     Plaintiff was an employee of IBM pursuant to the North Carolina Wage and Hour Act, N.C.G.S. § 95-25.1 et seq.

78.     The commission payments due and owing to Plaintiff constitute "wages" as that term is defined by the North Carolina Wage and Hour Act, N.C.G.S. § 95-25.2(16).

79.     Pursuant to N.C.G.S. § 95-25.6, Defendants were required to pay Plaintiff wages accruing to him, including commissions.

80.     Plaintiff had performed all duties necessary to consummate the sales at issue, which were ultimately closed in Defendants' favor, and all commission payments were earned by Plaintiff.

81.     Defendants have failed and refused to pay Plaintiff his sales commissions, which are due as set forth herein.

82.     Defendants have no policy or practice that would allow for the forfeiture of any such commissions by Plaintiff.

83.     Defendants are liable to Plaintiff in the amount of such unpaid commissions, plus interest at the legal rate from the date each such commission first became due.

84.     Pursuant to N.C.G.S. § 95-25.22, in addition to the unpaid commissions, Plaintiff is entitled to recover from Defendants as liquidated damages, an amount equal to the unpaid commissions that are due and owing to Plaintiff, plus the costs and fees of this action, including reasonable attorneys' fees.

85. As a direct and proximate result of IBM's violation of the North Carolina Wage and Hour Act, Mr. Trinh has been damaged in an amount exceeding $75,000.00, said amount to be proven at trial.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Fraudulent Misrepresentation – Telecom Deals)**

</div>

86. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

87. IBM, through its agents, represented to Mr. Trinh that his commissions would not be capped, in at least the following instances: (1) the PowerPoints, which IBM sent to Mr. Trinh to explain his commissions for the 2H 2018 sales period, and which Mr. Trinh reviewed, and which were always available via the intranet[1]; and (2) the statements by IBM executives and Managers that commissions would not be capped were made directly to Mr. Trinh at the beginning of each sales period, including the beginning of 2H 2018, when they discussed commissions and compensation for that period.

88. More specifically, IBM managers Mr. Kaplan and Mr. Berridge told Mr. Trinh during the 2H 2018 sales period that his commissions at IBM were uncapped.

89. IBM's representations to Mr. Trinh that commissions would not be capped were statements of IBM's commissions policy. When IBM executives, managers, and other employees told Mr. Trinh that his commissions would not be capped, they simply repeated what IBM had told them was IBM's official policy, which is set forth in the PowerPoints and on training materials that IBM uses to instruct managers how they should explain IBM's commissions policy to IBM sales employees like Mr. Trinh. IBM represented that Mr. Trinh's commissions would not

---

[1] The PowerPoints were created by, and with the guidance and input of, IBM managers at the highest levels of management and represents a binding representation by IBM about commissions.

be capped in virtually all IBM documents that explained how his commissions would be paid.

90.     Those representations were false.

91.     Those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Mr. Trinh in making those misrepresentations. Simply put, IBM knew that Mr. Trinh's commissions might be and would be capped, even though it told him in all of these instances that they would not be capped.

92.     Mr. Trinh reasonably and justifiably relied on the representations of IBM.  Notably, the representations were made after Mr. Trinh signed the IPL, including those in the PowerPoints, and those by IBM managers Mr. Kaplan and Mr. Berridge. Mr. Trinh reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM. Had Mr. Trinh known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Trinh known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

93.     The reasonableness of Mr. Trinh's reliance is supported by, among other things, the fact that Mr. Trinh's managers Mr. Kaplan and Mr. Berridge also believed that his commissions were uncapped, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey; the admissions in the Stephenson case by IBM and Mr. Stephenson's three managers; the admissions in the Swafford case by IBM and Mr. Swafford's three managers; and the admissions in the Beard case by IBM and IBM executive Inhi Cho Suh. Each of these individuals, and IBM itself, admitted that it was reasonable for a sales

representative to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin, Mr. Stephenson, and Mr. Swafford also testified that they relied on the same promises of uncapped commissions as Mr. Trinh, which further supports the reasonableness of Trinh's reliance.

94. Furthermore, IBM fraudulently concealed from Mr. Trinh that it would and did cap commissions, the fact that it had internal budgets for commissions, and all aspects of its practice of capping commissions. IBM had a duty to speak because (a) it chose to speak by telling Mr. Trinh and others that they would not be capped, thereby taking on a duty to make a full and fair disclosure of facts concerning the matters on which IBM chose to speak; and (b) it took affirmative steps to conceal material facts from Mr. Trinh. IBM failed to fulfill the duty to speak and make a full and fair disclosure of the facts. IBM concealed the facts with the intent to deceive Mr. Trinh, who was in fact deceived. Mr. Trinh justifiable relied on IBM's silence about those facts, and he was injured as a result of IBM's fraudulent concealment in an amount exceeding $75,000.

95. Mr. Trinh was damaged by IBM's fraudulent statements with respect to how he would be paid on the Telecom Deals in an amount exceeding $75,000.

## THIRD CLAIM FOR RELIEF
### (Alternative Claim - Negligent Misrepresentation – Telecom Deals)

96. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

97. Mr. Trinh alleges this claim in the alternative to the claim for fraudulent misrepresentation.

98. IBM, through its agents, represented to Mr. Trinh that his commissions would not be capped, in at least the following instances: (1) the PowerPoints, which, IBM sent to Mr. Trinh to explain his commissions for the 2H 2018 sales period, and which Mr. Trinh reviewed, and which were always available

via the intranet[2]; and (2) the statements by IBM executives and Managers that commissions would not be capped were made directly to Mr. Trinh at the beginning of each sales period, including the beginning of 2H 2018, when they discussed commissions and compensation for that period.

99. More specifically, IBM managers Mr. Kaplan and Mr. Berridge told Mr. Trinh during the 2H 2018 sales period that his commissions at IBM were uncapped.

100. IBM's representations to Mr. Trinh that commissions would not be capped were statements of IBM's commissions policy. When IBM executives, managers, and other employees told Mr. Trinh that his commissions would not be capped, they simply repeated what IBM had told them was IBM's official policy, which is set forth in the PowerPoints and on training materials that IBM uses to instruct managers how they should explain IBM's commissions policy to IBM sales employees like Mr. Trinh. IBM represented that Mr. Trinh's commissions would not be capped in virtually all IBM documents that explained how his commissions would be paid. IBM's agents made the representation negligently, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Mr. Trinh rely on the statements, and he reasonably and justifiably relied on the representations of IBM.

101. Notably, some or all of the representations were made after Mr. Trinh signed the IPL, including those in the PowerPoint, and those by IBM manager Mr. Kaplan and Mr. Berridge. Mr. Trinh reasonably and justifiably relied on the

---

[2] The PowerPoints were created by, and with the guidance and input of, IBM managers at the highest levels of management and represents a binding representation by IBM about commissions.

representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM.

102.    The reasonableness of Mr. Trinh's reliance is supported by, among other things, the fact that Mr. Trinh's managers Mr. Kaplan and Mr. Berridge also believed that his commissions were uncapped, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey; the admissions in the Stephenson case by IBM and Mr. Stephenson's three managers; and the admissions in the Swafford case by IBM and Mr. Swafford's three managers. Each of those individuals, and IBM itself, admitted that it was reasonable for a sales representative to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin, Mr. Stephenson, and Mr. Swafford also testified that they relied on the same promises of uncapped commissions as Mr. Trinh, which further supports the reasonableness of Mr. Trinh's reliance.

103.    Had Mr. Trinh known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Trinh known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

104.    IBM owed Mr. Trinh a duty of care in making the representations.

105.    Mr. Trinh reasonably and justifiably relied on the representations of IBM.

106.    Mr. Trinh was damaged by IBM's negligent misrepresentations.

107.    Mr. Trinh has been damaged by IBM's negligence with respect to how he would be paid on the Telecom Deals in an amount exceeding $75,000.00.

## FOURTH CLAIM FOR RELIEF
### (Alternative Claim – Quantum Meruit)

108.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

109.    Mr. Trinh rendered valuable consideration to IBM, in the form of work performed to close the Telecom and Kaiser deals, for which he has not been paid. The consideration has a reasonable value of *at least* $450,000, although the exact amount is for the jury.

110.    At the time that Mr. Trinh performed the work he reasonably expected to be paid by IBM.  IBM received and benefited from the work with knowledge or reason to know that Mr. Trinh expected to be paid. IBM voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

111.    Mr. Trinh is entitled under the doctrine of quantum meruit to recover damages from IBM in the amount of *at least* $75,000.

## FIFTH CLAIM FOR RELIEF
### (Alternative Claim - Unjust Enrichment)

112.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

113.    At the specific request of IBM and for its use and benefit, Mr. Trinh has performed work for IBM in the form of making sales of its software and services to Telecom and Kaiser.

114.    The value of the work performed for IBM by Mr. Trinh for which he has not been paid is *at least* $450,000, although the exact amount is for the jury.

115.    During and since the performance of the work by Mr. Trinh, IBM has failed to pay him and there is due and owing to Mr. Trinh from IBM, a principal sum amount of *at least* $450,00.

26

116. Despite Mr. Trinh being owed in excess of another $250,000, IBM has failed and refused to pay the same or any part of it.

117. As a result of IBM's refusal to pay Mr. Trinh the above-stated sum due and owing to him, IBM has become unjustly enriched in the amount of *at least* $75,000.

## SIXTH CLAIM FOR RELIEF
**(Punitive Damages)**

118. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

119. The actions and conduct of IBM, as set forth herein, entitle Mr. Trinh to compensatory damages, and are accompanied by aggravating factors which caused and relate to Mr. Trinh's injuries which give rise to his claim for compensatory damages.

120. This conduct, as set forth herein, includes, among other things, fraud.

121. IBM facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct giving rise to punitive damages, as set forth herein and otherwise.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Trinh prays the Court for the following relief:

1. Mr. Trinh have and recover from IBM for violation of the North Carolina Wage & Hour Act, in an amount exceeding $75,000, and interest and costs as allowed by law;

2. Mr. Trinh have and recover from IBM for fraudulent misrepresentation in an amount exceeding $75,000, and interest and costs as allowed by law;

3. Mr. Trinh have and recover from IBM for negligent misrepresentation in an amount exceeding $75,000, and interest and costs as allowed by law;

4.     Mr. Trinh have and recover from IBM for quantum meruit or unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

5.     That Mr. Trinh be awarded attorneys' fees under the North Carolina Wage & Hour Act, or other applicable law;

6.     That Mr. Trinh be awarded punitive damages;

7.     That all costs of this action be taxed against IBM; and

8.     That the Court award Mr. Trinh such other and further relief as this Court may deem just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted, this the 5th day of February 2021.

<div style="margin-left: 3em;">

/s/ Matthew E. Lee
Matthew E. Lee
Jeremy R. Williams
**WHITFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
matt@whitfieldbryson.com
jeremy@whitfieldbryson.com

Mark R. Sigmon
**SIGMON LAW, PLLC**
5 West Hargett Street, Suite 1001
Raleigh, North Carolina 27601
Telephone: (919) 451-6311
Facsimile: (919) 882-9057
mark@sigmonlawfirm.com

*Counsel for Plaintiff*

</div>